AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
Western District of Arkansas
El Dorado Division

<table>
<tr><td>

FILED
US DISTRICT COURT
WESTERN DISTRICT
OF ARKANSAS
Aug 23, 2023
OFFICE OF THE CLERK
</td></tr>
</table>

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO APPLE IPHONE WIRELESS TELEPHONES BEARING IMEI NUMBERS 351016091441288 and 353068108227349, RESPECTIVELY, WHICH DEVICES ARE CURRENTLY HELD IN FBI CUSTODY AT 100 E PEACH STREET, EL DORADO, UNION COUNTY, ARKANSAS, IN THE WESTERN DISTRICT OF ARKANSAS | No. _____ 1:23-cm-30 _____ <br><br> **Filed Under Seal** |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property, *(identify the person or describe property to be searched and give its location):*
> See "Attachment A"

located in the Western District of Arkansas, there is now concealed *(identify the person or describe the property to be seized)*:
> See "Attachment B."   **This Court has authority to issue the requested search warrant under Federal Rule of Criminal Procedure 41.**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*
- [ x ] evidence of a crime;
- [ x ] contraband, fruits of crime, or other items illegally possessed;
- [ x ] property designed for use, intended for use, or used in committing a crime;
- [ ] a person to be arrested or a person who is unlawfully restrained.

The search is related to violations, in the Western District of Arkansas, of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution, and possession with intent to distribute, controlled substances |
| 21 U.S.C. § 843(b) | Unlawful use of a communication facility to commit and facilitate the commission of a felony drug trafficking offense |
| 21 U.S.C. § 846 | Conspiracy to distribute, and to possess with intent to distribute, controlled substances |

The application is based on these facts:  (See attached affidavit of SA James Arnold, FBI)
- [ x ]  Continued on the attached sheet.

[ ]  Delayed notice of __ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

(Appearing by telephone conference call at 415-527-5035)
SA James Arnold, Federal Bureau of Investigation, *Affiant*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035.

Date: August 23, 2023

City and state: Texarkana, AR

*Judge's signature*

Hon. Barry A. Bryant, United States Magistrate Judge, W. D. Ark.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF TWO APPLE IPHONE WIRELESS TELEPHONES BEARING IMEI NUMBERS 351016091441288 and 353068108227349, RESPECTIVELY, WHICH DEVICES ARE CURRENTLY HELD IN FBI CUSTODY AT 100 E PEACH STREET, EL DORADO, UNION COUNTY, ARKANSAS, IN THE WESTERN DISTRICT OF ARKANSAS | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, James Arnold, a Special Agent with the Federal Bureau of Investigation (FBI), being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property described in Attachment A—an electronic device—which is currently in law enforcement possession, and the extraction from that property of the electronically stored information described in Attachment B.

2.     I have been employed as a Special Agent of the FBI since October 2019. Prior to my employment with the FBI, I served as a law enforcement officer in South Carolina for approximately nine and one-half years. During that time, I also served as a criminal analyst for the South Carolina Governors Counterdrug Task Force assigned to the Drug Enforcement Administration (DEA). I am currently assigned to the FBI Little Rock Division, El Dorado Resident Agency, where I am charged with investigating violations of various federal criminal laws. I have been trained and/or involved in various aspects of criminal investigations, including, among other things, debriefing defendants, sources, and informants; conducting surveillance and

undercover operations; executing arrest and search warrants; monitoring Title III wiretaps; and analyzing documentary and physical evidence. My duties as a Special Agent with the FBI also include the enforcement of federal criminal statutes focused on firearms, drug trafficking violations and criminal street gangs.

3.      The facts and statements contained in this affidavit are based in part on: my personal involvement with this investigation, information provided by other law enforcement agents; written reports about this and other investigations that I have received, directly or indirectly, from other law enforcement agents; information gathered from the service of subpoenas; the results of physical surveillance conducted by law enforcement agents; independent investigation and analysis by FBI agents/analysts. Additionally, this affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all my knowledge about this matter. Where my interpretations of statements or communications by others are set forth in this affidavit, those interpretations are based on my own training and experience as detailed herein, the training and experience of other investigators directly involved in the investigation, and/or the totality of the specific evidence uncovered in the course of the investigation detailed below, as applicable.

4.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that evidence constituting violations of Title 21, United States Code, Sections 841(a)(1) (distribution of, and/or possession with intent to distribute, controlled substances), 843(b) (use of a communication facility to facilitate the distribution of, and/or possession with intent to distribute, controlled substances), and 846 (attempt and/or conspiracy to distribute, and/or to possess with the intent to distribute, controlled substances), are currently present on the item described in Attachment A. There is also probable cause to search the property

2

described in Attachment A for evidence, instrumentalities, contraband, or fruits of these crimes further described in Attachment B.

### IDENTIFICATION OF THE PROPERTY TO BE SEARCHED

5.      As further described in Attachment A hereto, the property to be searched is described as two Apple 'iPhone' wireless telephones bearing International Mobile Equipment Identifier ("IMEI") numbers 351016091441288 and 353068108227349, respectively, which devices are marked with evidence numbers 1B233 and 1B234, and which are currently in the custody of the Federal Bureau of Investigation's El Dorado, Arkansas, Resident Agency, located at 100 East Peach Street, El Dorado, Union County, Arkansas, in the Western District of Arkansas (hereinafter collectively the "**Devices**").

6.      The warrant applied for would authorize the forensic examination of the **Devices** for the purpose of identifying the electronically stored data described in Attachment B.

### APPLICABLE STATUTES

7.      **Title 21 United States Code, Section 841(a)(1)** states: Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally – to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.

8.      **Title 21 United States Code, Section 846** states: Any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

3

## PROBABLE CAUSE

9.     In April of 2018, the FBI's El Dorado Resident Agency (RA) opened an investigation into a Drug Trafficking Organization (DTO) based in Magnolia, Columbia County, Arkansas, which is in the Western District of Arkansas. The portion of the investigation involving Christopher WALTERS was initiated based on intelligence gathered from a confidential source. WALTERS and several co-conspirators have been identified as members of the Walters Drug Trafficking Organization (WDTO) who were collectively involved in street gang activity and poly-drug trafficking in and around Columbia County, Arkansas. As detailed below, WALTERS is believed to have been a large quantity poly-drug distributer who obtained illegal drugs, including methamphetamine, from or through multiple sources of supply, including Michael CUMMINGS a/k/a "Main".

### July 2021 Interview of CS1

10.     In July of 2021, an FBI TFO interviewed a Confidential Source (hereinafter "CS-1") in reference to distribution of narcotics in Magnolia, Arkansas. CS-1 stated that WALTERS relocated from Watts, California, to Magnolia, Arkansas, in 2016 and is a member of the PJ Watts Crip criminal gang. CS-1 further indicated that WALTERS is a large-scale distributer of methamphetamine, ecstasy, pills, and marijuana. CS-1 stated, in part, that WALTERS' source of supply (hereinafter SOS), who WALTERS referred to as "Main," is located in California.

### Controlled Purchases of Methamphetamine

11.     Between August 2021 and July 2022, FBI investigators utilized confidential sources (CSs) to conduct numerous successful controlled purchases of methamphetamine from DTO members in the Western District of Arkansas, including from WALTERS, John L. GRISSOM, Jvance RADFORD, and Lacadran THOMAS.  A Drug Enforcement Administration

4

(DEA) laboratory has since confirmed that substances purchased during each of these controlled buys do in fact contain methamphetamine, a Schedule II controlled substance.

12.     Among these controlled buys were four made from Walters, sometimes aided by other DTO members, in August 2021, early and late February 2022, and late March 2022.  Over the course of those four buy operations, Walters sold the CS(s) a combined total of approximately 1.8 kilograms (nearly 4 pounds) of actual (pure) methamphetamine, as later determined by a DEA laboratory.

**Exemplary Controlled Purchase of Methamphetamine from Walters**

13.     In early February 2022, a confidential source (hereinafter CS-2) made a consensually monitored telephone call to WALTERS at 870-904-7344 (hereinafter TT#1), in order to arrange a later controlled purchase of methamphetamine from WALTERS. The call was recorded and completed in the presence of Agents. During the call, WALTERS answered and immediately told CS-2 that he would 'hit him right back,' which I know, from my training and experience, is slang indicating that WALTERS would return CS-2's call shortly. Soon thereafter, CS-2 received a return call from WALTERS, this time calling from the telephone number 323-841-0813 (Target Telephone Two or TT#2). Area code 323 is assigned to areas of Los Angeles, California. During that call, which was also recorded, CS-2 requested two (2) pounds of methamphetamine, to which WALTERS responded "Let me know when you're on your way. I'll have that shit put together for you." CS-2 indicated that he/she believed that WALTERS was probably in California at the time, resupplying on methamphetamine.

14.     On or about February 10, 2022, acting under the control and supervision of the FBI, CS-2 conducted a controlled purchase of approximately 453 grams (approximately one pound) of methamphetamine from WALTERS, via an unknown male (UM) intermediary (later identified as

5

GRISSOM), in McNeil, Columbia County, Arkansas. While meeting with agents prior to that buy, CS-2 also showed agents text messages between CS-2 and TT#1, in which WALTERS told CS-2 to give the cash to 'his boy.' In the presence of Agents, CS-2 sent a text message to the TT#1 advising WALTERS of his/her location and asking what to do. Soon thereafter, CS-2 received a telephone call from UM at 870-949-4757 (hereinafter TT#5), who advised CS-2 where to meet him. CS-2 also received a text message from TT#1 which shared the UM's contact information, including the above phone number ending in 4757 and a name of "Lil John". After being equipped with one or more covert audio/video recording devices, with which to record the transaction, CS-2 then departed the meeting with agents and met the UM, who led him/her by vehicle to a residence in McNeil, Arkansas.

15.     Shortly thereafter, CS-2 returned to meet with agents, at which time CS-2 turned over to agents approximately 453 grams (approximately 1 pound) of suspected methamphetamine, which CS-2 indicated had been provided to them by the above-described UM. A NIC field test of the suspected methamphetamine was conducted and provided a presumptive positive indication for the presence of methamphetamine or methylenedioxymethamphetamine (MDMA or "ecstasy"), which I know from my training and experience are chemically related. Both methamphetamine and MDMA are controlled substances under federal law. Based on the appearance of the substance tested, and in consideration of their training and experience, agents have concluded that the substance contains methamphetamine. A review of the audio and video recording of the above-described controlled purchase was consistent with the information provided by CS-2. Although the UM's face cannot be seen in the recording (he wore a mask during the transaction with CS-2), his clothing and other identifying characteristics can be seen.

16.     Immediately after CS-2 finished the above-described February 10 drug transaction, agents also followed the red Honda Accord from where it had been seen stopped by CS-2's vehicle. As agents followed it, the red Honda Accord travelled south on U.S. 79, towards Magnolia, Arkansas, eventually turning into the Magnolia Walmart parking lot. Agents then observed a man get out of the passenger side of the red Honda Accord. The man was wearing clothes similar to those worn by the masked man video described in the preceding paragraph but was not masked. He also appeared to fit the same general description of the masked man in the video. Agents observed the man enter the Walmart store, and then come out again a short while later, carrying a receipt.

17.     Investigators later obtained Walmart surveillance footage from February 10, 2022. A review of that footage clearly shows the above-described man from the red Honda Accord entering the store, going to the Walmart MoneyCenter[1], counting U.S. Currency while in line, and completing a transaction at the MoneyCenter counter. The description of the man matches that of the masked man from the February 10 controlled purchase. CS-2 also later independently advised agents that the masked man from the February 10 controlled purchase was in fact GRISSOM.

### Conversations Between Walters and Cummings

18.     In May 2022, a Reliable Confidential Source of information (hereinafter "RCS") began providing FBI details of contemporaneous conversations between WALTERS and other DTO members. These conversations were intended to, and often did, facilitate the DTO's drug trafficking activities in the Western District of Arkansas, and elsewhere.

---

[1]   According to the Walmart webpage, the Walmart MoneyCenter offers a wide variety of financial services including cash and transfer services, insurance, tax services, and more.

19.     On June 15, 2022, the RCS detailed conversations between WALTERS and CUMMINGS (the latter using telephone number 562-208-3513)[2], in which WALTERS and CUMMINGS discussed what I interpret to be a plan for CUMMINGS to resupply WALTERS with controlled substances—possibly by train. During the June 15 conversations, WALTERS told CUMMINGS 'hey imma umm, imma leave tomorrow night nigga so you don't think you can get him down here.' CUMMINGS replied in part, 'you gonna leave tomorrow night alright let me start looking right now, let me call that nigga at the train station.' Later the same day CUMMINGS told WALTERS 'yea he would leave tomorrow like around like five something and he'll be there on Sunday at 3:00 am.' WALTERS replied, in part, 'so i can drive down there and hurry up and see him and get right back.' CUMMINGS then asked WALTERS 'But what what what you want to send him there with?', which I interpret to be CUMMINGS asking WALTERS what type of illegal drugs he should send the individual with. WALTERS then told CUMMINGS 'Boy called me today so im ready for both of yall now', which I interpret to mean that WALTERS had the money to pay both CUMMINGS and an unknown individual for the drugs to be supplied by CUMMINGS. Thereafter, CUMMINGS replied 'So when we get this bread back we send him on the next one gotcha' and 'I'm about to book it right now', which I interpret as CUMMINGS telling WALTERS that he would book something (possibly a train ticket), and that the controlled substances would be sent after WALTERS' payment was received.

20.     In sum, I interpret the above-described June 15 conversations as follows: WALTERS asked CUMMINGS to resupply WALTERS with illegal drugs. CUMMINGS then indicated to WALTERS, during these conversations, that CUMMINGS would make contact with

---

[2]     Pursuant to an FBI-issued administrative subpoena, on or about October 24, 202,2 Sprint identified the subscriber of this telephone number as Michael Cummings, of Hawaiian Gardens, CA.

CUMMINGS' courier—who agents believe possibly travels by train—in order to obtain payment, and possibly resupply WALTERS with those illegal drugs. From the content of the above-described June 15 conversations (and because the reliable confidential source of information has only indicated that CUMMINGS and WALTERS spoke by phone on that one single date) agents believe it likely that CUMMINGS and WALTERS also communicated via other means.

**June 2022 Conversations Between Walters and D. Jordan, regarding "Main"**

21.     On June 29, 2022, the same RCS detailed conversations between WALTERS and Dawnisha JORDAN (hereinafter D. JORDAN). During the June 29 conversations, WALTERS told D. JORDAN 'Let me try to see where Main at. Imma try to see if he'll Cash App you the money', which I interpret to mean that WALTERS planned to ask "Main" (possibly the SOS identified by CS-1) to send D. JORDAN two-hundred dollars ($200) by way of Cash App (an online money transfer service). A short time later, D. JORDAN told WALTERS she had received the two-hundred dollars from the individual, ostensibly "Main." Based on information obtained through the RCS, no other phone communications by WALTERS are known to have taken place during the time between these two June 29 conversations. From my training and experience, I conclude that this indicates that WALTERS likely contacted "Main" utilizing some other means of communication.

**Facebook Communications between Walters and Cummings**

22.     On July 7, 2022, Hon. Barry A. Bryant, United States Magistrate Judge for the Western District of Arkansas, issued a federal search warrant for certain records and information (including the content of communications) in the possession of Meta Platforms, Inc. (hereinafter "Meta"), which operates Facebook, an online social media service. The specific materials to be disclosed pursuant to that warrant related to WALTERS' personal Facebook account (hereinafter

9

"TA#3)[3]. An FBI review of the records Meta provided for TA#3 has since revealed communications between WALTERS and CUMMINGS (the latter utilizing a Facebook account hereinafter referred to as "TA#4")[4], via Facebook's "Messenger" feature. From training and experience, I know that Facebook Messenger allows users to send private text and multimedia messages, and also to make video calls, to one another—commonly by using a free "Messenger" app that Facebook makes available for wireless phones. I interpret certain of WALTERS' and CUMMINGS' Facebook Messenger communications to relate to the distribution of controlled substances by CUMMINGS to WALTERS.

23.  Among the records provided by Meta for TA#3, I have observed Facebook Messenger communications between WALTERS and the user of the TA#4 which began on August 6, 2021, and ended on June 29, 2022. A review of Facebook Messenger communications occurring on June 29, 2022—the date in which WALTERS told D. JORDAN that he would have "Main" send her money via Cashapp, as discussed above—reveals that WALTERS called CUMMINGS through Facebook Messenger's video chat feature and subsequently sent a photograph of a Cashapp account. The photograph depicted the Cashapp handle "$tyydagirly", which agentS have previously identified as being utilized by D. JORDAN[5]. Subsequently, the user of TA#4 sent WALTERS a message stating "Just sent cuzzo." Moreover, based on my training and experience,

---

[3]  I have probable cause to believe that TA#3 belongs to, and was being used at all times relevant to this Affidavit by, Christopher WALTERS. I recognized the male subject then depicted in TA#3's account profile picture (commonly used to show the identity of the account user) as WALTERS. I was able to recognize WALTERS from having previously viewed known images of him, including his official Arkansas driver's license photo.

[4]  I have probable cause to believe that TA#4 belongs to, and was being used at all times relevant to this Affidavit by, Michael CUMMINGS. In reviewing publicly-visible Facebook 'posts' by the user of TA#4, I have observed several photos featuring a man I recognize as CUMMINGS. The context in which these photos were posted leads me to conclude, based on my training and experience, that the man depicted in them is the user of TA#4. I was able to recognize the man depicted in these photos as CUMMINGS from having previously viewed known images of him, including his official California driver's license photo.

[5]  Open-source research conducted by the FBI has located records associating this Cashapp account with D. JORDAN's known telephone number, 424-237-0358.

10

including with this and other investigations, additional communications to and from WALTERS indicate that the user of TA#4 likely supplies or facilitates the supply of illegal drugs to WALTERS. Below is a portion of the Facebook Messenger communications between WALTERS and the user of the TA#4, between June 18 and June 22, 2022, as provided by Meta:

CW: "What time his train leaves"

CW: "Michael missed your video chat" (Indicating the audio/video call was unanswered)

TA#4: "Michael called you"

CW: "Happy Father's Day"

CW: "Address"

TA#4: "3200 Bankhead Dr Little Rock Arkansas"

TA#4: "262"

TA#4: "Seal it cuzzo"

CW: "Ok"

CW: "Trying to get some rest real quick"

TA#4: "Ok got you"

CW: "You called Michael"

TA#4: "The video chat ended"

TA#4: "Michael called you"

TA#4: "Michael called you"

TA#4: "What's the total sent cuzzo"

CW: "28/25"

24.     I interpret the above referenced Facebook Messenger communications as follows: WALTERS and CUMMINGS are discussing the same drug and/or money courier referenced in

the above-described June 15, 2022 conversation (see paragraphs 19 and 20). During this Facebook communication, WALTERS asks CUMMINGS when the courier is departing ("What time his train leaves"). Later, WALTERS asks for a location to meet the courier ("Address"), to which CUMMINGS replies and provides an address and room number ("3200 Bankhead Dr Little Rock Arkansas", "262"). Later, CUMMINGS ask WALTERS how much US Currency he provided the courier ("What's the total sent cuzzo"), to which WALTERS replies "28/25," which I interpret to mean $28,000 and $25,000.

### Search of Walters' Two Magnolia Residences

25.     On August 10, 2022, FBI investigators searched WALTERS' two Magnolia, Arkansas, residences, which are located at 923 West Monroe and 1119 Linda Streets.  These searches were conducted pursuant to two federal search warrants issued on August 4, 2022. [6]

26.     Inside 1119 Linda Street (which was WALTERS' primary residence at the time), investigators found and seized, among other things, approximately 1,094 grams (slightly under 1.1 kilograms) of a substance later determined by a DEA laboratory to contain cocaine, a Schedule II controlled substance, and 144 suspected 'ecstasy' tablets (which were later determined by a DEA laboratory to contain a total of 1.12 grams (+/- 0.28 grams) of actual (pure) methamphetamine).

27.     Inside 923 West Monroe Street (which WALTERS controlled, and kept property in), investigators found and seized, among other things, 2,075 suspected fentanyl tablets weighing approximately 224.8 grams (at least 70% of which, to a minimum 95% level of confidence, were later determined by a DEA laboratory to contain para-fluorofentanyl, a fentanyl analogue and Schedule I controlled substance), approximately 35 grams (about 1.2 ounces) of a substance that later 'field-tested' positive for the presence of cocaine, and $10,230.99 in cash.

---

[6] *See* W.D.A.R. Docket Nos. 1:22-cm-00040 and 1:22-cm-00041.

28.     When the search warrant was executed at 923 West Monroe Street, a woman named Malaysia BENJAMIN and her children were found inside the residence. Following *Miranda* warnings, Benjamin told investigators that, within the past ten days, she had seen WALTERS and another man converting powder cocaine into cocaine base (commonly known as "crack" cocaine) in the kitchen of the West Monroe Street residence. Benjamin also stated that WALTERS had told her that he was being supplied with controlled substances by a California resident, who Benjamin referred to as "Man".[7]

### Proffer Interview of Walters

29.     In January of 2023, WALTERS, accompanied by his attorney, provided a proffer to the government. Although WALTERS did so in hopes that the government might make favorable concessions in WALTERS' ongoing federal prosecution, the United States has not made or promised WALTERS any such concessions to-date. Under a signed proffer agreement stating as much, WALTERS identified "Main" as CUMMINGS. WALTERS told investigators that CUMMINGS was a California-based drug supplier for WALTERS. According to WALTERS, between January and August 2022, WALTERS obtained no less than fifty pounds (50), but possibly as much as one-hundred pounds (100), of methamphetamine through CUMMINGS every two weeks. WALTERS stated that CUMMINGS had the drugs transported to WALTERS, in the Western District of Arkansas, by various means, including by employing couriers to transport the drugs via commercial planes and passenger trains. WALTERS said that, just prior to the execution of the aforementioned residential search warrants on August 10, 2022, WALTERS had obtained two (2) kilograms of cocaine through CUMMINGS, for $40,000.

---

[7] Although co-defendant/DTO member Antonio JOHNSON is known to use the moniker "Mann", I interpret the person Benjamin referred to as "Man" as being Michael CUMMINGS, who uses a similar alias—"Main". Among other reasons for this interpretation, I note that CUMMINGS is a resident of California, whereas JOHNSON lives in the Magnolia, Arkansas, area.

30.     During the course of the interview, WALTERS was shown a selection of Facebook messages sent or received between TA#3 and TA#4 (see paragraph 23 above). WALTERS identified himself as the user of TA#3 and CUMMINGS as the user of TA#4. Also, WALTERS was shown a photo array containing a known photograph of CUMMINGS, namely his California drivers license photo. WALTERS positively identified CUMMINGS as "Main," the individual who supplied him with methamphetamine, cocaine, and other illegal drugs for further distribution in the Western District of Arkansas.

### Arrest of Cummings

31.     On May 19, 2023, pursuant to a federal arrest warrant issued in the Western District of Arkansas, FBI investigators located and arrested CUMMINGS in Los Angeles, California. In the course of taking CUMMINGS into custody, Agents located the **Devices** on CUMMINGS' person. The **Devices** were seized as evidence, pending this search warrant application.

32.     Following his arrest, CUMMINGS also consented to a search of his nearby vehicle. Inside CUMMINGS' vehicle, FBI investigators found what they suspected, based on their own training and experience, was approximately one kilogram of powder cocaine and about one ounce of cocaine base—both Schedule II controlled substances under federal law. Those substances were seized as evidence, and a laboratory analysis of them remains pending. However, samples of those substances have been subjected to chemical 'field-tests' capable of detecting the presence of certain controlled substances, including cocaine. The tested samples of those substances reacted presumptively positive for the presence of cocaine.

33.     The **Devices** are currently held in secure storage at the FBI's El Dorado, Arkansas, Resident Agency, located at 100 E Peach Street, El Dorado, Arkansas, in the Western District of Arkansas. From my training and experience, I know that the **Devices** have been stored in such a

14

manner as to assure that their contents remain in substantially the same state as when they were first seized from CUMMINGS on May 19.

## TECHNICAL TERMS

34.     Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:   A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.    These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.   Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images.  Images can usually be retrieved by connecting the camera to a computer or by connecting the

removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images.  This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player:  A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files.  However, a portable media player can also store other digital data.  Some portable media players can use removable storage media.  Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data.  Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS:  A GPS navigation device uses the Global Positioning System to display its current location.  It often contains records the locations where it has been.  Some GPS navigation devices can give a user driving or walking directions to another location.  These devices can contain records of the addresses or locations involved in such navigation.  The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers.  These signals are sent by radio, using specifications that are publicly available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna

receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

35.  Based on my training, experience, and research I know that the **Devices** have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. I also know that information stored on devices like the **Devices** can remain there indefinitely, and is often recoverable by trained technicians even if the user has

17

attempted to remove or delete it.  Moreover, in my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

36.    Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

37.    *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Device because:

    a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

    b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

    c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

38. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

39. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

40. For the reasons set forth above, there is probable cause to believe that evidence of will be located on or within the **Devices** described in Attachment A. Throughout this investigation,

19

CUMMINGS was observed to utilize electronic and telephonic means of communication to coordinate illicit drug transactions.  This is consistent with my training and experience that individuals involved in narcotics trafficking commonly utilize—and in most cases are functionally dependent upon—electronic devices like those described in Attachment A to make their drug trafficking activities possible, including for coordinating drug transactions with customers and sources of supply.  Moreover, at the time of his arrest in California, Cummings was in possession of both the **Devices** *and* over a kilogram (2.2 pounds) of cocaine, a Schedule II controlled substance under federal law.  I know, from my training and experience, that such a large quantity of cocaine is inconsistent with possession for personal use.  I therefore have probable cause to believe that Cummings possessed the **Devices** at the same time that he possessed that cocaine for purposes of distribution.  That conclusion is consistent with the other evidence in this case, indicating that Cummings supplied Walters with cocaine, as well as methamphetamine, for distribution in the Western District of Arkansas.

41.     In light of the foregoing, I have probable cause to believe that the **Devices** (described in Attachment A) contain evidence, fruits and/or instrumentalities (described in Attachment B) of violations, in the Western District of Arkansas and elsewhere, of Title 21, United States Code, Sections 841(a)(1) (distribution of, and/or possession with intent to distribute, controlled substances), 843(b) (use of a communication facility to facilitate the distribution of, and/or possession with intent to distribute, controlled substances), and 846 (attempt and/or conspiracy to distribute, and/or to possess with the intent to distribute, controlled substances).

42.     Therefore, I respectfully request this Court to issue a warrant to search the electronic devices described in Attachment A, to seize the evidence, fruits, and instrumentalities described in Attachment B, which individually or collectively constitute violation(s) of Title 21,

United States Code, Sections 841(a)(1) (distribution of, and/or possession with intent to distribute, controlled substances), 843(b) (use of a communication facility to facilitate the distribution of, and/or possession with intent to distribute, controlled substances), and 846 (attempt and/or conspiracy to distribute, and/or to possess with the intent to distribute, controlled substances).

Respectfully submitted,

(Appearing by telephone conference call at 415-527-5035)
Special Agent James Arnold
Federal Bureau of Investigation

Attested to by the affiant in accordance with the requirements of Fed. R. Crim. P. 4.1, by appearing via telephone conference call at 415-527-5035 on this 23$^{d}$ day of _August_, 2023.

HON. BARRY A. BRYANT
UNITED STATES MAGISTRATE JUDGE

## ATTACHMENT A

### Property to Be Searched

The property to be searched is described as two Apple 'iPhone' wireless telephones bearing International Mobile Equipment Identifier ("IMEI") numbers 351016091441288 and 353068108227349, respectively, which devices are marked with evidence numbers 1B233 and 1B234, and which are currently in the custody of the Federal Bureau of Investigation's El Dorado, Arkansas, Resident Agency, located at 100 East Peach Street, El Dorado, Union County, Arkansas, in the Western District of Arkansas (hereinafter collectively the "**Devices**").

This warrant authorizes the forensic examination of the **Devices** for the purpose of locating the electronically stored information described in Attachment B.

## ATTACHMENT B

### Particular Things to be Seized

1.      All records, information, and/or materials on or within the **Devices** described in Attachment A which are, and/or which contain, evidence, fruits and/or instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) (distribution of, and/or possession with intent to distribute, controlled substances), 843(b) (use of a communication facility to facilitate the distribution of, and/or possession with intent to distribute, controlled substances), and 846 (attempt and/or conspiracy to distribute, and/or to possess with the intent to distribute, controlled substances), including, but not limited to:

  a.  lists of customers and related identifying information;

  b.  types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

  c.  any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

  d.  any information recording CUMMINGS' schedule or travel from August 1, 2021 to the present;

  e.  all bank records, checks, credit card bills, account information, and other financial records.

2.      Evidence of user attribution showing who used or owned the **Devices** at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

3.      As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

      4.     This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.